**19MAG 6795**              **ORIGINAL**

Approved: *Michael Neff*
MICHAEL D. NEFF / ANDREW D. BEATY
Assistant United States Attorneys

Before: THE HONORABLE STEWART D. AARON
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

       - v. -                   :

GLENN BLICHT,                   :

       Defendant.               :

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 1343, 1346, & 2;
29 U.S.C. § 186

COUNTY OF OFFENSE:
NEW YORK

- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

       STEPHEN DONNELLY, being duly sworn, deposes and says that he is a Special Agent with the United States Department of Labor ("DOL"), Office of Inspector General, and charges as follows:

## COUNT ONE
### (Labor Union Official Request or Receipt of Prohibited Payment)

       1. From at least in or about 2009 through in or about July 2019, in the Southern District of New York and elsewhere, GLENN BLICHT, the defendant, an officer of a labor organization (the "Union"), did unlawfully and willfully request, demand, receive and accept, and agree to receive and accept the payment, loan, and delivery of a thing of money exceeding $1,000 in value from an employer (the "Employer") whose employees were employed in an industry affecting commerce and whose employees such labor organization represented, sought to represent and would have admitted to membership, in violation of Title 29, United States Code, Sections 186(b)(1) and (d)(2), and aided and abetted the same, to wit, BLICHT demanded and received cash payments to himself in exchange for, among other things, not filing arbitration claims against the Employer.

       (Title 29, United States Code, Section 186(b)(1) and
Title 18, United States Code, Section 2.)

**COUNT TWO**
**(Honest Services Fraud)**

2. From at least in or about 2009 up to and including in or about July 2019, in the Southern District of New York and elsewhere, GLENN BLICHT, the defendant, having devised and intending to devise a scheme and artifice to defraud, and to deprive the Union of its intangible right to his honest services, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice to defraud, and aided and abetted the same, to wit, BLICHT demanded and received cash payments to himself in exchange for, among other things, not filing arbitration claims against the Employer.

(Title 18, United States Code, Sections 1343, 1346, and 2.)

The bases for my knowledge and for the foregoing charge are, in part and among other things, as follows:

3. I am a Special Agent with DOL. I am assigned to the Office of Inspector General Office of Investigations -- Labor Racketeering and Fraud. As part of my work at DOL, I have received training regarding employee welfare benefit plans, labor unions, and fraud and other crimes relating to such plans and unions. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

**OVERVIEW**

4. As discussed further below, from at least in or about 2009 through in or about July 2019, GLENN BLICHT, the defendant, served as an officer of the Union, including as its President for many years. In that capacity, he demanded bribe payments from the Employer in exchange for BLICHT's agreeing not to file arbitrations against the Employer. In total, BLICHT

2

received at least approximately $150,000 from the Employer over approximately 10 years. In doing so, BLICHT chose to receive personal payments instead of vigorously representing the interests of the Union.

## STATUTORY FRAMEWORK - THE TAFT-HARTLEY ACT

5. From my knowledge, training, experience, and conversations with others, including other law enforcement officers, I have learned the following, among other things:

    a. The Labor Management Relations Act of 1947, also known as the Taft-Hartley Act, 29 U.S.C. §§ 141-197 *et seq.*, is a federal law that, among other things, prohibits certain activities of labor unions and their officials on the one hand, and those who employ union members on the other.[1]

    b. One such prohibition makes many types of payments between an employer and a union -- like those at issue in this case -- a crime.

    c. By way of illustration, where a particular union (say, "Union-1") represents the employees of a particular employer (say, "Employer-1"), 29 U.S.C. § 186(a)(2) prohibits Employer-1 from paying "any money or other thing of value" to Union-1, or to Union-1's employees or officers, so long as Employer-1's industry affects commerce and so long as certain statutory exceptions do not apply.[2]

    d. A related prohibition makes it a crime not only to make such a payment, but also to receive one. Thus, it is a crime for Union-1, or Union-1's employee or officer, to "request, demand, receive, or accept" "any money or other thing of value" from Union-1, so long as the same conditions are met.

---

[1] *See, e.g., United States v. Local 1804-1, Int'l Longshoremen's Ass'n*, 812 F. Supp. 1303, 1326 (S.D.N.Y. 1993) ("Congress enacted the National Labor Relations (Taft-Hartley) Act of 1947 to prevent bribery of union officials by employers and extortion of employers by union officials.") (citing *Arroyo v. United States*, 359 U.S. 419, 424-26 (1959)).

[2] The exceptions are set forth in 29 U.S.C. § 186(c) and include, for instance, payments to satisfy a court judgment or arbitration award, as well as the sale of a commodity at "the prevailing market price."

3

e. These prohibitions prevent payments that risk a union becoming beholden to an *employer*, rather than vigorously representing union members and their interests.

f. Accordingly, it is a criminal violation of the Taft-Hartley Act for a Union President, like GLENN BLICHT, the defendant, to demand (and receive) bribe payments from the Employer, whose industry -- dry cleaning and linen laundry -- affects commerce.

### BLICHT'S BRIBE SCHEME

6. From my conversations with the President of the Employer who is a cooperating witness ("CW-1"),[3] my review of Union and Employer documents, and my analysis of bank account records, as well as my training, experience, and involvement in this investigation, I have learned the following, in substance and in part:

a. Since in or about 2007, the Union has represented the workers at the Employer. In that capacity, the employees of the Employer were required by the collective bargaining agreement ("CBA") to pay dues to the Union.

b. In his capacity as a Union officer, including as its President, GLENN BLICHT, the defendant, has occupied a "position[] of trust" in relation to the Union "and its members." Therefore, BLICHT has a duty to act in the Union's best interests, including by (1) "refrain[ing] from holding or acquiring any pecuniary or personal interest which conflicts with the interests of" the Union, and (2) "account[ing] to the [Union] for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the [Union]." *See generally* Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 501 *et seq.*

c. In his capacity as a Union officer, including as its President, BLICHT interacted with CW-1 on numerous occasions over more than a decade. During those

---

[3] CW-1 is a cooperating witness who has pleaded guilty to tax and Tart-Hartley Act violations. CW-1 is cooperating with the Government in the hope of receiving leniency at sentencing. CW-1 has provided reliable information to law enforcement, corroborated by, among other things, consensually recorded meetings, phone calls, text messages, and financial records.

4

interactions, BLICHT referred to the Union as a "sweetheart union" and told CW-1 that CW-1 had a "sweetheart deal." Based on my training, experience, and involvement in this investigation, I am aware that a "sweetheart" deal is abnormally favorable to the employer and abnormally unfavorable to union workers. In other words, I believe that BLICHT was accepting bribe payments from CW-1 in exchange for BLICHT's not vigorously representing Union members' interests.

    d. Beginning in or about 2009, BLICHT directed CW-1 to make payments to BLICHT approximately five times per year. The CBA did not contemplate any such payments from the Employer directly to the Union or to any of the Union's officers personally.

    e. BLICHT referred to these payments as "tickets," in which each ticket equaled $1,000. In advance of each payment, BLICHT told CW-1 how many "tickets" to pay BLICHT. Initially, the payments were approximately $5,000 each time, but they were later reduced, and generally varied between approximately $2,000 and approximately $5,000 per payment. CW-1 made these payments as directed by BLICHT both in New York, New York, and in New Jersey, including at the Union's offices.

    f. Over the years, if CW-1 did not make "ticket" payments as instructed, BLICHT would file a large quantity of arbitration claims against the Employer. CW-1 understood that these claims were intended to harass CW-1 (e.g., through paperwork and legal fees) into resuming paying bribes to BLICHT. Once CW-1 resumed paying the bribes, BLICHT would dismiss the arbitration claims.

    g. In or about June 2016, DOL conducted a search at the Employer pursuant to a search warrant authorized by this Court. After the search warrant was executed, BLICHT did not see or speak to CW-1 for a few weeks, which CW-1 found to be aberrant. After approximately two weeks, CW-1 and BLICHT met in person, and BLICHT asked CW-1, in substance and in part, "what the Feds were asking." BLICHT also asked CW-1 if there had been any mention of "the tickets," to which CW-1 replied there had not been. BLICHT also referred to CW-1 as "taboo" after the search warrant.

    7. Since in or about October 2018, CW-1 has met with GLENN BLICHT, the defendant, and continued to make payments to BLICHT at the direction of DOL. As detailed below, CW-1 has made approximately three payments at DOL's direction, each for

several thousand dollars. At the direction of DOL, CW-1 recorded and preserved in-person meetings, phone conversations, and text message exchanges with BLICHT. Based on review of these recordings, my conversations with CW-1, and my training, experience, and familiarity with this investigation, I have learned the following:

  a. On or about October 18, 2018, CW-1 met with BLICHT in person at a diner in New York, New York. After some conversation, BLICHT suggested that CW-1 turn off CW-1's cellphone, and BLICHT said he would do the same. Thereafter, BLICHT turned the conversation to "tickets," and CW-1 asked whether the tickets could be paid the following week. They then scheduled another meeting for the following week.

  b. On or about November 13, 2018, at an in-person meeting in New York, New York, CW-1 delivered approximately $3,000 in cash to BLICHT.

  c. On or about December 11, 2018, after CW-1 and BLICHT had arranged a meeting, BLICHT sent a text message to CW-1 stating, "U bring tickets I'll get breakfast." CW-1 responded, "Deal." Later that day, at the meeting, which was recorded, CW-1 delivered $2,000 in cash to BLICHT in New York, New York.

  d. On or about January 2, 2019, during a recorded phone call, BLICHT and CW-1 spoke by phone to set up another meeting. BLICHT told CW-1, in substance and in part, "I was asking you whether you could bring the four tickets on Monday." On or about January 6, 2019, during a recorded phone call, BLICHT and CW-1 again discussed setting up a meeting for "the tickets."

  e. On or about January 10, 2019, at an in-person meeting in New York, New York, CW-1 delivered approximately $2,000 in cash to BLICHT.

  f. On or about January 20, 2019, during a recorded phone call, in response to BLICHT requesting another meeting, CW-1 responded, "I have to get to the bank first in New York."

  g. On or about January 23, 2019, during a recorded phone call, CW-1 made excuses during a phone call with BLICHT, about why CW-1 needed more time to get cash. CW-1 then asked about an ongoing dispute between the Union and the

6

Employer: "What's the story with the union?" BLICHT responded, "I took care of my end, so we'll see what happens now. . . . you owe me for that one too."

    h. For approximately six months, at the direction of DOL, CW-1 did not make any bribe payments to BLICHT. During that time period, BLICHT became increasingly irritable toward CW-1 and leveraged the Union to make threats against the Employer, as set forth below.

    i. In or about early 2019, after CW-1 had not paid BLICHT for some time, BLICHT sent a text message to CW-1, stating:

> I don't appreciate being avoided.....
> lose my number.
> It's been going on for over 2 weeks
> I'm filing charges at NLRB!!![4]

    j. In or around mid-March 2019, after CW-1 had not paid BLICHT for some time, BLICHT sent a text message to CW-1, stating, in part: "I'm down in Tampa for meeting like to see you next week" / "That's before I go to Labor Board". CW-1 responded with a text message stating, "I'm sorry I never done this to u." BLICHT then replied, "OK just a reminder 3mos of dues is owed." CW-1 attempted to clarify by asking "For [Employer]?," to which BLICHT responded, "Not [Employer], u know." CW-1 understood BLICHT to be referring to the overdue "ticket" payments.

    k. On or about March 27, 2019, BLICHT sent a text message to CW-1 stating: "I don't appreciate being ignored.... I'll be filing for arbitration tomorrow regarding Ny and [NJ]." Indeed, during 2019, the Union filed approximately four arbitration claims against the Employer.

    l. On or about May 3, 2019, CW-1 sent a text message to BLICHT that said, "Give me 2 weeks and I'll have the 9 tickets. 8." BLICHT responded with a text message stating, "It's 10 u know but ok."

---

[4] Based on my training, experience, and involvement in this investigation, I believe that BLICHT was referring to filing charges against the Employer with the National Labor Relations Board.

m.  On or about July 12, 2019, during a recorded phone call, CW-1 raised a pending arbitration with BLICHT that BLICHT had caused the Union to file against the Employer. CW-1 asked BLICHT to postpone the arbitration to allow CW-1 the opportunity to pay BLICHT tickets. CW-1 explained CW-1's understanding that by paying tickets, BLICHT would help CW-1 avoid arbitration. BLICHT responded, in substance and in part, that it was "supposed to work like that," but that CW-1 had been too delinquent in CW-1's ticket payments. BLICHT then told CW-1 that CW-1 owes BLICHT 14 tickets, because CW-1 has not paid since January. Eventually, BLICHT agreed to consider postponing the arbitration after CW-1 assured BLICHT that CW-1 would make it "worth [his] while."

n.  Later that day, BLICHT sent CW-1 a text message stating, "I'm not putting it off unless you get current for 5mos at least." CW-1 understood this message to mean that BLICHT would not postpone the arbitration unless CW-1 paid BLICHT ten tickets. CW-1 replied, by text message, "u mean 10 tickets on the 26th?" BLICHT responded with a text message stating, "Yes". BLICHT added, "So you let me know by Monday". CW-1 replied, with a text message stating, "I will no later then Tuesday".

o.  On or about Monday, July 15, 2019, BLICHT sent CW-1 a text message stating, "If I don't hear from you tomorrow by noon, I'm not canceling."

p.  On or about July 15, 2019, during a follow-up recorded phone call that evening, CW-1 informed BLICHT that, "I have the 10, I'm ready to go with 10 tickets." They then set up a meeting to deliver the bribe money on Friday, July 26, 2019. In a follow-up recorded phone call, BLICHT told CW-1 that he would cancel the scheduled arbitration, which had been scheduled to proceed before July 26, 2019.

q.  In a subsequent recorded call on or about July 18, 2019, BLICHT confirmed the July 26 meeting and threatened CW-1: "Don't screw me on this. 'Cause if you do -- this is not a threat, it's a promise -- you're gonna regret it."



WHEREFORE, deponent prays that an arrest warrant be issued for GLENN BLICHT, the defendant, and that BLICHT be arrested and imprisoned or bailed, as the case may be.

STEPHEN DONNELLY
Special Agent
U.S. Department of Labor,
   Office of Inspector General

Sworn to before me this
23rd day of July, 2019

THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK